### UNITED STATES v. CITY OF MOLINE.[1]

(District Court, N. D. Illinois. July 3, 1897.)

1. NAVIGABLE WATERS—POWER OF CONGRESS TO REMOVE OBSTRUCTION.
   When congress has assumed jurisdiction over a navigable river lying
   wholly within one state, congress has power to order obstructions to
   navigation removed, even though their construction was authorized by such
   state.

2. SAME—BRIDGES—EMINENT DOMAIN.
   When a bridge over a navigable river is authorized by a state legislature,
   reserving a right to require a draw in the bridge on a certain contingency,
   congress, on assuming control of the river, may require the construction of
   a draw in the bridge upon the happening of such contingency, without
   providing for compensation to the bridge owners.

3. CONSTITUTIONAL LAW — DELEGATING LEGISLATIVE AND JUDICIAL POWERS—
   BRIDGES.
   Act Cong. Sept. 19, 1890, § 4, authorizing the secretary of war to give
   notice for the alteration of bridges that he believes to be unreasonable

---

1 Reported by Louis Boisot, Jr., Esq., of the Chicago bar.

obstructions to navigation, and empowering the district attorney to prosecute parties refusing to comply with such notice, is not unconstitutional, as vesting the secretary with either judicial or legislative powers.

At Law. On motion to quash information.

Information against the city of Moline for obstructing a navigable water way.

John C. Black, U. S. Dist. Atty.

S. W. Odell and W. R. Moore, for defendant.

GROSSCUP, District Judge. The information, read in connection with the plans for the building of the Illinois & Mississippi Canal, shows that it is the purpose of the United States to construct a canal from the Illinois river, at or near the town of Hennepin, to the Mississippi river, at or above the mouth of Rock river, together with the necessary feeders thereto; that at Milan, about five or six miles below what is known as the "Moline Bridge," to a point about five or six miles above this bridge, the proposed canal is to follow the bed of and use Rock river as a part thereof; that Rock river is situated in the state of Illinois, within this district, and is a navigable water way of the United States; that the bridge known as the "Moline Bridge," and owned and controlled by the city of Moline, is now, and will be when said canal is finished, an unreasonable obstruction to the navigation of said water way; that the secretary of war, in pursuance of statute, has notified the city of Moline so to alter the bridge by putting in draws, etc., as will make said river at said point practically navigable; that the period for making such changes has passed, and the city of Moline still neglects and refuses to conform to the requirements of such notice and order of the secretary of war, and continues to maintain such obstruction, whereby its acts in the premises are a misdemeanor, under section 5 of the act of September 19, 1890.

The motion to quash necessarily admits the truth of the averments of the information. The city, by its counsel, in effect contends: First, that the river in question is wholly within the state of Illinois, and has never been declared, by the government of the United States, to be a navigable stream; second, that the bridge in question was lawfully authorized by the legislature of Illinois, is the lawful property of the city of Moline, and cannot be taken or injured by the government of the United States without just compensation; third, that the proceedings of the secretary of war giving rise to this information are in pursuance of a statute unconstitutional, and therefore void. Many statutes of the state of Illinois providing for and authorizing dams and bridges across Rock river are exhibited by counsel in support of this contention, and have been judicially taken notice of in the disposition of this motion.

The constitution confers upon congress the exclusive right to regulate interstate commerce. A water way like Rock river, emptying into the Mississippi river, though lying wholly within the state of Illinois, is, if navigable, one of the highways of interstate commerce. It leads, with its connections, from points within Illinois to points in other states, and is thus a part of the water way which, as an entirety,

82 F.—38

interconnects cities in many states, and carries the commerce of many states. Any obstruction to such a water way, in the face of a mandate of congress that the river shall be used as one of its interstate water ways, is open to removal by the proper authority of the United States government. The fact that the state may have authorized the structure is of no avail from the moment that the government of the United States determines to employ the river as such an interstate highway.

Has congress indicated such a purpose? The act of 1888 provides for the location of a canal from the Illinois river, at or near the town of Hennepin, to the Mississippi river, at or near the mouth of Rock river, to be 80 feet wide at the water line, and to have a depth of not less than 7 feet of water, with locks, feeders, etc., and that the secretary of war shall cause to be made and submitted to congress detailed plans and estimates for such construction. In pursuance of this act the canal was, by the secretary of war, duly located, and detailed plans and estimates for its construction submitted, which plans and estimates included the use of Rock river, averred by the information to be navigable, from a point five or six miles below the bridge in question to a point five or six miles above. Following this action of the war department, the congress of 1889–90 passed an act authorizing the secretary of war to construct the canal upon the plans and specifications submitted, with power to make certain alterations in respect of the locks and feeders, and with the necessary powers of eminent domain. Following this, the congress of 1891–92 made appropriations for the construction of such canal, and the acquirement of right of way; and every congress since has continued such appropriations. These acts clearly indicate a defined purpose upon the part of congress, as far back, at least, as 1889 or 1890, to use Rock river for a distance of several miles above and below the bridge in question as a part of the proposed water way. As a navigable water of the United States, congress had, at any time, the right to enter upon its improvement; and the plans adopted by congress in effect adopt the river, for the distance pointed out, as a part of the proposed water way. The acts of congress, read in connection with the plans and specifications of the war department upon which the acts proceed, look to a navigable water way from the Illinois river to the Mississippi, and utilize towards that end so much of the Rock river—a stream admittedly navigable—as seems best adapted to that purpose. The improvement, therefore, is, in effect, an improvement in the navigability of the river. The effect of all these acts is that congress has taken into its jurisdiction, as one of the navigable waters of the United States, that portion of Rock river where this bridge is located, intending thereby to make it a part of the proposed water way from the Illinois river to the Mississippi river. From the moment of such a declaration, the power of congress over the portion of the river designated is supreme. Any obstructions, however authorized by the state law, must yield to this superior authority.

But the right of congress to remove the obstruction does not, of itself, exempt the government of the United States from the duty of making just compensation for such property rights as are taken.

Monongahela Nav. Co. v. U. S., 148 U. S. 312, 13 Sup. Ct. 622. The right of congress to interfere with such property rests simply upon its power to regulate commerce. It has no other right touching such property. But, says Justice Brewer, for the supreme court, in Monongahela Nav. Co. v. U. S., supra:

"Like the other powers granted to congress by the constitution, the power to regulate commerce is subject to all the limitations imposed by such instrument, and among them is that of the fifth amendment we have heretofore quoted. Congress has supreme control over the regulation of commerce; but if, in exercising that supreme control, it deems it necessary to take private property, then it must proceed subject to the limitations imposed by this fifth amendment, and can take only on payment of just compensation. The power to regulate commerce is not given in any broader terms than that to establish post offices and post roads; but, if congress wishes to take private property upon which to build a post office, it must either agree upon the price with the owner, or in condemnation pay just compensation therefor."

The inquiry, then, is: Has the city of Moline a property right in this bridge inconsistent with the control to be taken by congress, and the changes made in consequence thereof? If so, compensation must be first made. The ownership of the city of Moline is as successor to the Moline & Rock River Plank & Macadamized Road & Bridge Company, which company was, on the 14th of February, 1855, authorized to build a toll bridge across Rock river at the point where the bridge in question crosses the river. The franchise thus granted was purchased by the city of Moline May 6, 1876. This act of the legislature provided that a draw should not be required in such bridge until such time as the legislature should require draws to be placed in the Chicago & Rock Island Railroad Company's bridge and the Rock Island & Camden Railroad Company's bridge,—the first located about eight miles above the Moline bridge, and the other at Milan, several miles below. Now, it seems to me that this franchise to the bridge company clearly contemplated that Rock river might, at some time in the future, be used for the purpose of practical navigation, and that, when that time came, the bridge company should so readjust its structure, without cost to the state, as to make it adaptable to such navigation. The company was exempted from such readjustment only so long as the two railway bridges—the one above and the other below—enjoyed a like exemption. The franchise was unquestionably accepted with reference to this possible changed use of this river in the future, and with equal reference to the duty of the company to change its bridge accordingly, without further compensation, when that time came. The implied stipulation to change the structure without compensation was a part of the terms on which the franchise was granted. Unquestionably, the legislature of Illinois could, without compensation, have required the construction of a draw at the time that a like draw was required of the two railway companies.

The proceedings to change the use by the construction of the draws both here and at the railway bridges are under acts of congress instead of the legislature of the state. It is true that at the point where the railway bridges cross the river the proposed water way is not in the bed of the river, but at one side. But this can make no difference in the substance of the requirement. It is true, also, that because the water way

is not in the bed of the river the railroads will be compensated for such draw. But there is no provision in the franchise to the bridge company providing that it shall receive like compensation, or that the draw shall not be required until a draw without compensation is required of the two railway companies. It is true, also, that the government of the United States, not the legislature of Illinois, is the power that commands this change. This, literally, is a variance from the terms of the franchise. But the act in question must be considered upon no such narrow lines. It contemplated simply immunity from change in the matter of the draw until the river was needed for navigation, and it is immaterial whether that need is now declared by the legislature of the state or the government of the United States. The real substance of the contract between the bridge company and the state was that the company should have the right to erect, control, and use the bridge as a toll bridge, without interference in the way of putting in, compulsorily, a draw, until, under the acts of some authority competent to act, the river should be employed for the purposes of practical navigation. The provision looked towards ultimate improvement of the river's navigability; and that such improvement might come at the hands of the nation was certainly contemplated. The only interference with the bridge proposed by congress is this compulsory construction of a draw,—a right clearly reserved by the legislature of Illinois in granting the franchise. Congress, in effect, proposed to take, for the purpose of making the river navigable, only what the legislature of Illinois could, under the literal terms of its contract with the company, have taken for the same purpose. Such a reservation in favor of the state of Illinois inures, in my judgment, to the nation, when the authority of the United States is exercised for the same purpose.

But it is contended that the proceedings of the secretary of war under the fourth section of the act of September 19, 1890, are invalid, because such section is unconstitutional. The section provides that, whenever the secretary of war shall have good reason to believe that any bridge now constructed over any navigable water way of the United States is an unreasonable obstruction to the free navigation of such waters on account of insufficient height, width of span, or otherwise, it shall be his duty, first giving the parties reasonable opportunity to be heard, to give notice to the person owning or controlling such bridge so to alter the same as to render navigation under it free, easy, and unobstructed, and in giving such notice to specify the changes required to be made, and prescribe a reasonable time in which to make them. If, at the end of such time, the alteration has not been made, the district attorney for the proper district is empowered to bring the criminal proceeding here instituted. U. S. v. Keokuk & H. Bridge Co., 45 Fed. 178, was a case where a bridge had been built and maintained in accordance with the requirements of the act of congress across the Mississippi river at Keokuk. The secretary of war declared that, by reason of its location, it rendered, at certain stages of the water, navigation over the Des Moines rapids through the west draw difficult, and ordered that it be so altered as to render navigation through or under it free, easy, and unobstruct-

ed. On demurrer to the petition, Judge Shiras held that, the present status of the bridge having been fixed by act of congress, and the bridge being, therefore, a lawful structure, it was not within the power of congress to delegate to the secretary of war power to change such status; but that such power of change, whatever it might be, was exercisable only by congress itself. U. S. v. Rider, 50 Fed. 406, was a case where the county commissioners of Muskingum county, Ohio, were notified by the secretary of war to change a bridge then being over the Muskingum river, a navigable stream of the United States, so as to provide a draw span in said bridge whereby free navigation of the river could be obtained. Judge Sage held the notice given to have been unreasonable, and, further commenting upon the case, expressed his concurrence in the conclusion of Judge Shiras in U. S. v. Keokuk & H. Bridge Co., supra, to the effect that congress could not delegate, as it had undertaken to do, its authority in the matter under discussion to the secretary of war. These two cases are the only adjudications I know of upon the constitutionality of this statute. In Lake Shore & M. S. R. Co. v. Ohio, 165 U. S. 365, 17 Sup. Ct. 357, the supreme court, having under consideration a similar case, expressly passed, without deciding, the question whether congress could lawfully delegate to the secretary of war all its powers to authorize structures of every kind over all navigable waters.

I have already held, for the purposes of this motion, that Rock river, at the point under consideration, is, in fact, a navigable stream; that congress has, by the acts, beginning in 1888, relative to the Illinois & Mississippi Canal, assumed jurisdiction of such stream from the point below the bridge to the point above the bridge, between which the canal uses, for its purpose, the river; that through that space of the river the proposed government work is, in effect, an improvement of the navigation of Rock river; that the bridge of the city of Moline over the river is unprovided with a draw, and is, in such condition, palpably, an obstruction to the navigation of the stream; that the necessity of a draw was recognized with the increase of navigation of the river, and the right to impose it reserved, in the act of legislature creating the bridge franchise. Now, if congress can constitutionally authorize any of its executive officers to deal with a case like this, whereby the obstruction may be removed, and the water way opened up, without having first passed an act specifically applicable to the given obstruction, these proceedings ought to be maintained. It will be observed that the power claimed in this instance is not to either authorize the building of a bridge, or ordering its construction, thereby drawing with it the decision of what streams congress either takes or surrenders jurisdiction over. The power claimed is, in effect, an incident only to the execution of the larger purpose of congress respecting Rock river, and administrative of that purpose. It is one of the essential administrative acts towards carrying out the special acts of congress, to the effect that through this river, at this point, there shall be a waterway having capacity for vessels of at least 280 tons burden. The bridge, during the time of its present construction, is an effectual obstruction to such water way. If congress can, by special act, constitutionally endow the arm of the secretary of war

with power to remove everything that lies in or across that river obstructive to the proposed water way, why may it not grant such power, with equal efficacy, by a general act applying to all cases as they arise? Whether the act conferring the power be special or general, the war department becomes simply the arm that carries out the legislative will. It is true that this involves decision of the department, but the department can in no instance be an effective, and at the same time an insensate and unjudging, executive instrument. In administrative undertakings of this character the directions cannot be so completely foredrawn by congress that there will be left no questions to the administrative mind to decide. The test of the legality of the delegation of power is, not that the administrator must himself decide questions as they arise, but, are the questions thus presented essentially judicial?

In this case, two questions alone arise: First. Is the bridge an obstruction to navigation? Second. Is it there by any such legal right that the government may not interfere with it in the respect designated without just compensation? The first question is purely administrative, and is one that congress can certainly delegate to the secretary of war. A thousand questions of equal moment to the parties interested, and of equal difficulty, are necessarily delegated to the great departments of the government every month. In the very nature of things, congress cannot dispose of them. A government of the size of this, operated upon such a conception, would be clogged immediately. The second question is, undoubtedly, judicial, and for that very reason is not subject, constitutionally, to the decision of congress any more than of the secretary of war. If the bridge be there by legal right,—if it be a franchise or property that cannot be taken except after just compensation,—congress is powerless, either by special or general acts, to touch it. In the face of such property right, congress is as helpless as the war department. In the end, such right, whether it be attacked by special act of congress, or by some action of the war department, will, through some channel, find an appeal to the judiciary. This right of appeal to the judiciary in all questions in their nature judicial is preserved in the sections of the statute under discussion. The secretary of war has no power to carry out his decisions respecting these obstructions except through a court. Any question, whether of law or fact, essentially judicial, may be raised under these informations. A court of the United States stands always, by the clear provisions of the act, between the decision of the secretary and its execution. There is, therefore, in the act, no delegation of judicial power to the secretary that is not open to review in the courts. I hold, therefore, that the act, so far as it is applicable to the case in hand, is constitutional and valid, and the motion to quash will be overruled.