UNITED STATES v. UNION BRIDGE CO.

(District Court, W. D. Pennsylvania. February 9, 1906.)

No. 1.

**1. NAVIGABLE WATERS—ALLEGHENY RIVER.**

The Allegheny river is a navigable waterway subject to the jurisdiction of the United States, having been declared a navigable stream by the Legislatures of Pennsylvania and New York in 1798 and 1807, respectively, and included in the plans and covered by appropriations of the national government for the improvement of interstate waterways and of the harbor of Pittsburgh for many years.

**2. SAME—OBSTRUCTIONS TO NAVIGATION—CHARTER RIGHTS FROM STATE.**

A company which built a bridge over the Allegheny river under a charter from the state of Pennsylvania containing no specifications as to the character of the structure, but expressly providing that it should not obstruct the navigation of the river, and that the piers should be constructed in such manner as to meet the requisitions of the law in regard to obstruction of navigation, holds the franchise granted subject to such conditions, and may be required at any time by any authority having lawful jurisdiction to so alter its bridge as to meet the enlarged requirements of navigation.

[Ed. Note.—For cases in point, see vol. 37, Cent. Dig. Navigable Waters, § 86, 91.]

**3. SAME—POWERS OF CONGRESS—REQUIRING REMOVAL OF OBSTRUCTIONS.**

The power conferred on Congress by the Constitution to regulate commerce with foreign nations and among the several states includes the power to determine what shall or shall not be deemed in the judgment of the law an obstruction to navigation in any waterway used in carrying on such commerce, and, such power being without any limitation as to the means or manner in which it shall be exercised, Congress may pass legislation requiring the removal of obstructions and commit the enforcement of such law to one of the administrative departments whenever such department shall determine the fact that an obstruction exists in violation of the law.

[Ed. Note.—For cases in point, see vol. 37, Cent. Dig. Navigable Waters, §§ 2, 149.]

**4. SAME—STRUCTURES AUTHORIZED BY STATE.**

In the absence of legislation on the subject by Congress, a state may lawfully authorize the building of any structure in the navigable waters within its limits, but the right so granted is held subject to the right of Congress at any time to require the removal or alteration of such structure as an obstruction to navigation, where such waterway is used as a means for carrying on interstate or foreign commerce.

[Ed. Note.—For cases in point, see vol. 37, Cent. Dig. Navigable Waters, §§ 2, 149.]

**5. SAME—ACT REQUIRING ALTERATION OF BRIDGES—CONSTITUTIONALITY.**

Act March 3, 1899, c. 425, § 18, 30 Stat. 1153 [U. S. Comp. St. 1901, p. 3545], which provides that on a determination by the Secretary of War that any bridge "now constructed or which may hereafter be constructed over any of the navigable waterways of the United States is an unreasonable obstruction to the free navigation of such waters," after notice to the parties interested, he shall require the same to be altered so as to render navigation through or under it reasonably free, and making the willful failure to obey such order a misdemeanor, is within the power of Congress and is not unconstitutional as taking the property of the bridge owner for public use without compensation.

**6. Same.**

> The right of the United States to require the removal or alteration of a bridge as an obstruction to navigation of an interstate waterway is not affected by the fact that it made no objection when the bridge was built, or that it was built under authority from the state, nor do such facts render the government liable to compensate the owner for his loss, where the consent of Congress was not asked; the owner being chargeable with notice of its power over such waters and its right to exercise the same at any time.

On Motion to Impose Sentence and Motion in Arrest of Judgment.

Albert Bettinger, John W. Dunkle, U. S. Atty., and R. W. Gibson, Asst. U. S. Atty.

William B. Rogers and John McCleave, for Union Bridge Co.

BUFFINGTON, District Judge. This is a proceeding by the United States against the Union Bridge Company, in the nature of a criminal information, for failure to alter a bridge which is an alleged obstructon to navigation. On the trial thereof no issues of fact were raised. The points of law submitted by the government were affirmed pro forma, those submitted by the bridge company denied pro forma, and a verdict of guilty, under the charge of the court, rendered by the jury. Motions were then made; one by the government to impose sentence, and one by the bridge company in arrest of judgment. In its charge the court stated an opinion would be filed later as part thereof, which is now done.

The obstruction here involved consists of a bridge over the Allegheny river just above its junction with the Monongahela at Pittsburgh. The Allegheny river rises in Pennsylvania, flows north into New York state, and thence back into Pennsylvania. The latter state, by Act March 21, 1798 (3 Smiths' Laws, p. 320), enacted the Allegheny, from the New York state line to its mouth, a navigable stream, and the state of New York, by Act March 31, 1807, did likewise in its counties of Genesee and Allegheny. The Allegheny is the principal branch of the Ohio; its volume being six times greater than that of the Monongahela. It is included in the general plan for the improvement by the national government of local interstate waterways and the harbor of Pittsburgh. The government has built or has now in process of construction a system of locks and dams on the Allegheny which will slackwater the stream for 27 miles from its mouth. The Davis Island dam, situate five miles below Pittsburgh on the Ohio river, raises the water in the Allegheny and Monongahela at their junction six feet above their normal depths, and backs its water to the first dams of the Allegheny and Monongahela slackwater systems, respectively. These waters form the harbor of Pittsburgh, the importance of which harbor will be appreciated from the fact that the tonnage in water transportation passing from it the past year exceeded that of the Suez Canal for the same period. From its size, interstate relation, and its being a part of this really great harbor, it will be seen that the Allegheny answers the requirement of a navigable stream (The Montello 78 U. S. 411, 20 L. Ed. 191), and is also one over which the national government has assumed jurisdiction. The Union Bridge is a pier-supported, wooden structure. It crosses from Pittsburgh to Alle-

gheny City, and is the first bridge on the Allegheny. It was built in 1874–75 by the Union Bridge Company, a corporation chartered by the state of Pennsylvania March 13, 1873 (P. L. 274), and was opened for travel July, 1875. In pursuance of the agreement of counsel at the argument that all federal acts pertinent to the cause should be considered by the court. we have examined the federal legislation affecting the Allegheny river prior to the building of this bridge. By the act of April 30, 1824 (4 Stat. 22, c. 46), Congress inaugurated the system under which appropriations were annually made providing for surveys and the report thereof to Congress during the period later referred to herein, viz., from 1828 to 1838. That act provided:

"That the President of the United States is hereby authorized to cause the necessary surveys, plans, and estimates, to be made of the routes of such roads and canals as he may deem of national importance, in a commercial or military point of view, or necessary for the transportation of the public mail."

By virtue of this act, Congress by resolution of December 9, 1828, authorized the examination of "the Allegheny river from the city of Pittsburgh to the mouth of French creek, at Franklin, with a view to a slackwater navigation." Such survey, a distance of 121 miles, was made by the War Department and the report thereof made, which survey and report were on June 8, 1832, reported to Congress and form H. R. Document No. 265 of the first session of the Twenty-Second Congress. This report showed the river could be made navigable to Franklin for a 4½-foot stage, all the year around, by a slackwater system, for 85-ton boats, which the report states was the type in use on the Ohio. By H. R. Document No. 343, second session of the Twenty-Fifth Congress, it appears that another survey was made in 1836–37, in pursuance of a resolution of Congress, and the same was reported to that body on March 23, 1838. This survey was an interstate one. It began in Pennsylvania, extended through New York state, and thence to connect with the prior survey, in all a distance of 274 miles. An examination of the report of the war department engineers shows that this survey was made in pursuance of a plan to connect the great river system of the west and southwest with the New York state canals then building. In that report the present navigation of the Allegheny was illustrated by the draft and capacity of the steamboat New Castle then engaged in that river trade. "This steamboat," the report says, "has carried and towed sixty tons. She has carried eighty passengers and three hundred and fifty bushels of coal and drew two and a half feet of water. * * * The steamboat New Castle has ascended, without great difficulty, from Pittsburg to Olean, and could even, under present circumstances, make regular trips between these places whenever there is sufficient depth of water to pass the chutes of the various dams which have been illegally erected across the river by indiviudals, to the serious injury of the navigation." The navigable depth to be obtained by the improvement of the Ohio was considered the desired standard for the Allegheny, and confidence was expressed that "there is no longer a doubt of the practicability of deepening the channels of the Ohio river on

the bars, so as to afford at least 3½ feet water at its lowest stage from the Mississippi to Louisville. * * * It is a navigation equal to this and upon the same plans, as near as circumstances will permit their application." The report stated "that we wish to secure to the Allegheny river; and I entertain not the slightest doubt of the entire practicability of the undertaking." It will thus be seen that in this project, which had in view connecting the canal system of New York state with the entire river systems of the west and southwest, the Allegheny river was an important interstate link, for, as the report stated, "if the Allegheny river should be improved from Olean to Pittsburgh, a water communication is opened for a distance of more than twelve thousand miles, extending far into the heart of one of the most fertile regions of the globe." The report shows that the notes, maps, profiles, and plans of this work were burned, and no steps were taken toward slackwatering the stream until shortly after the Union Bridge was built; but this early work by Congress evidences an assumption by the national government, at least to the extent of survey and examination, of jurisdiction over the Allegheny as a proper subject of interstate navigation improvement.

It will also be noted that the use of the Allegheny was included by the government in its plans for the creation of a deep-water harbor for Pittsburgh. This is fully set forth in the report of Maj. Merrill of December 2, 1874, found in Chief of Engineers' Report of 1875, vol. 2, p. 687. Briefly stated, that report shows a public agitation for many years for a deeper harbor for Pittsburgh; long study and investigation as to the proper type of dams by the war department engineers; the approval of the movable dam system; the determination to place such a dam so as to slackwater the harbor and the necessity of using the Allegheny for such harbor. The movement culminated in the passage of the act of March 3, 1875, by virtue of which the Davis Island experimental dam, then and still the largest movable dam built, was constructed, and forms the harbor of the city. In view of the public interest and agitation over this proposed improvement, the fact that the Allegheny was to be used as part of the harbor, the deterrent effect of the public notice by the engineer in charge, referred to hereafter in Judge Taft's opinion, that this bridge would obstruct navigation, becomes more significant.

By act of Congress of March 3, 1899 (30 Stat. 1153, c. 425, § 18 [U. S. Comp. St. 1901, p. 3545]), it was provided as follows:

"That whenever the Secretary of War shall have good reason to believe that any railroad or other bridge now constructed, or which may hereafter be constructed, over any of the navigable waterways of the United States is an unreasonable obstruction to the free navigation of such waters on account of insufficient height, width of span, or otherwise, or where there is difficulty in passing the draw opening or the draw span of such bridge by rafts, steamboats, or other water craft, it shall be the duty of the said Secretary, first giving the parties reasonable opportunity to be heard, to give notice to the persons or corporations owning or controlling such bridge so as to alter the same as to render navigation through or under it reasonably free, easy, and unobstructed; and in giving such notice he shall specify the changes recommended by the Chief of Engineers that are required to be made, and shall prescribe in each case a reasonable time in which to make them. If at the

end of such time, the alteration has not been made, the Secretary of War shall forthwith notify the United States District Attorney for the district in which such bridge is situated, to the end that the criminal proceedings hereinafter mentioned may be taken. If the persons, corporation or association owning or controlling any railroad or other bridge shall, after receiving notice to that effect, as hereinbefore required, from the Secretary of War, and within the time prescribed by him, willfully fail or refuse to remove the same or to comply with the lawful order of the Secretary of War in the premises, such persons, corporations, or association shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding five thousand dollars, and every month such persons, corporation, or association shall remain in default in respect to the removal or alteration of such bridge shall be deemed a new offense, and subject the persons, corporation, or association so offending to the penalties above prescribed. Provided, that in any case arising under the provisions in this section an appeal or writ of error may be taken from the district courts or from the existing circuit courts direct to the Supreme Court either by the United States or by the defendants."

The proceedings in this case were had under this act, and as their regularity, their conformity thereto, and the fact that the bridge company had a legal hearing thereunder are questioned, we deem it proper to here recite such proceedings in extenso. Under date of August, 1902, sundry citizens, corporations, and associations in and about Pittsburgh presented a petition to the Secretary of War, setting forth the incorporation of the Union Bridge Company by the state, the building of the bridge in question, alleging it was an unreasonable obstruction to the navigation of the Ohio, Monongahela, and Allegheny rivers, and praying him to investigate. It was, moreover, suggested that on such investigation action be taken against the owners of the bridge in accordance with the act above quoted. After presentation thereof to the Secretary, the petition was on September 23, 1902, referred for report to W. L. Sibert, captain of the corps of engineers in charge of government work in the Pittsburgh district. On October 13, 1902, Capt. Sibert, in response thereto, reported, among other things, to the chief of engineers, the location, height, and pier riprapping of the bridge, that it was an unreasonable obstruction to navigation, and suggested that the interests of navigation "demand that this bridge shall have a channel span giving a clear height of 70 feet above the pool made by the Davis Island dam. This height is necessary at the Union Bridge in order to make a harbor at Pittsburgh for its immense shipping." On October 16, 1902, the petition and the report of Capt. Sibert were returned to the Secretary of War by the chief of engineers with the statement:

"I recommend that the papers be returned to Capt. Sibert with instructions to hold a public hearing, after due notice to all interested parties, as required by the law and the orders of the War Department of Sept. 16, 1891."

On October 18, 1902, this recommendation was approved by the Secretary of War, and on October 23d a reference to Capt. Sibert was ordered. Pursuant thereto notice of such hearing was given to all interested parties, that to the Union Bridge Company being served on November 3, 1902, reading as follows:

"Whereas, the Secretary of War has good reason to believe that the bridge connecting the cities of Pittsburgh and Allegheny, at or near the mouth of the Allegheny river, known as the Union Bridge, is an unreasonable obstruc-

tion to the free navigation of the Allegheny river at the Pittsburgh harbor. on acount of insufficient height and width of span, and of wide and high riprapping at the piers, it is proposed to require the following changes to be made in said bridge by the 30th dáy of November 1903, to wit:   That the bridge be so altered as to give two navigable spans extending riverward from the left abutment, of not less than 394 feet clear width each; the second, or right-handed, span to give a clear headroom over the Davis Island pool of not less than 70 feet, and the first span of not less than 70 feet at the pier and 62 feet at the abutment; also that the piers of the altered structure shall have no riprapping or other pier protection above an elevation of 10 feet below the surface of Davis Island pool, and that all parts of the old structure not comprised in the new construction and in conformity with the above requirements shall be wholly removed.   In order to give you an opportunity to be heard as required by the act of Congress approved March 3, 1899, you are hereby notified that a. hearing will be had before me, at room 409, Post Office Building, on the east side of Smithfield street, between Third and Fourth avenues, in Pittsburgh, Pennsylvania, at 10 o'clock a. m., on the 14th day of November, 1902, where and when you will be given an opportunity to be heard in the matter.   As all the papers will be laid before the Secretary of War for his decision it will perhaps best suit your purpose to submit in writing whatever you may wish to present."

Hearings were had on the day fixed and subsequent adjournment, which were attended by the Union Bridge Company through its attorney and several of its officers, by parties and counsel representing railroad and passenger bridges crossing the Allegheny farther up stream, by commercial bodies of Pittsburgh, by persons and companies engaged in river transportation and by counsel for the City of Pittsburgh. From the minutes it appears that at the opening of such hearing Capt. Sibert announced its objects were, first, to ascertain the fact whether this bridge was an unreasonable obstruction to navigation; second, whether the changes presented in the notice of hearing are such as navigation interests demand; third, whether the time specified in which the changes should be made is reasonable. At the hearing the bridge company presented an answer in which it stated, inter alia:

"The proposition embodied in the notice from the government will require the removal of the present structure.   If carried out, it will result in the entire suspension of the operations of this company, because the investment cannot yield any adequate return for the capital."

No question or issue of the bridge being an obstruction to navigation was raised by the answer. Attention being specially called to this, the bridge company, through its counsel, stated:

"I purposely omitted that because I thought it was a question largely in the discretion of the government, and as I said, I did not care to occupy an antagonistic position, but to suggest our situation to the government."

And in passing it will be noted that no effort was made by the bridge company to question then or at the jury trial the fact that this bridge was an unreasonable obstruction to navigation. On December 8, 1902, Capt. Sibert returned to the chief of engineers a record of his proceedings, together with a recommendation of a notice to alter the bridge to be given the bridge company. This recommendation was approved by the chief of engineers and adopted by the Secretary of War, Hon. Elihu Root, who, on January 20, 1903, issued an order

which was served on the bridge company, on January 26, 1903, as follows:

"Take notice that, whereas, the Secretary of War has good reason to believe that the bridge of the Union Bridge Company, a corporation existing under the laws of the state of Pennsylvania, across the Allegheny river, and connecting the cities of Pittsburgh and Allegheny, Pennsylvania (said bridge being known as the Union Bridge), is an unreasonable obstruction to the free navigation of the said Allegheny river (which is one of the navigable water ways of the United States) on account of insufficient height and width of span, and of wide and high riprapping at the piers; and whereas, the following alterations, which have been recommended by the chief of engineers, are required to render navigation under it reasonably free, easy and unobstructed, to wit: Alter said bridge so as to give two navigable spans extending riverward from the left abutment, of not less than 394 feet clear width each; the second span from the Pittsburgh shore to give a clear headroom over the Davis Island pool of not less than 70 feet at the pier and 62 feet at the abutment; also that the piers of the altered structure shall have no riprapping or other pier protection above an elevation of 10 feet below the surface of Davis Island pool, and that all parts of the old structure not comprised in the new construction and in conformity with the above requirements shall be wholly removed. And whereas, eighteen (18) months from the date of service of this notice is a reasonable time in which to alter the said bridge as described above: Now, therefore, in obedience to, and by virtue of section 18, of an act of the Congress of the United States entitled, 'An act making appropriations for the construction, repair, and preservation of certain public works on rivers and harbors, and for other purposes,' approved March 3, 1899, I, Elihu Root, Secretary of War, do hereby notify the said Union Bridge Company to alter the said bridge as described above, and prescribe that said alterations shall be made and completed on or before the expiration of eighteen months from the date of service hereof."

Act March 3, 1899, c. 425, 30 Stat. 1153 [U. S. Comp. St. 1901, p. 3545].

The bridge company took no steps to alter, change, or remove the bridge and in this shape the matter rested until July 23, 1904, three days before the expiration of the 18 months' time provided in the notice, when its counsel presented a petition to the then Secretary of War, Judge Taft, describing itself therein as the Union Bridge Company, "owning and operating the Union Bridge, over the Allegheny river at Pittsburgh, Pennsylvania, under and by virtue of the authority of the United States Government," setting forth the making of the order to alter, that it would expire July 26, 1904, and praying such time to be extended and a day fixed to present reasons for a rehearing. In pursuance of this petition, the Secretary of War, having temporarily suspended from time to time the order to alter the bridge, heard the arguments of counsel for the bridge company, and thereafter, on July 21, 1905, delivered an opinion as follows:

"The Union Bridge is an unreasonable obstruction to commerce of the Allegheny river. If the bridge were not there, the winter refuge which the stretch of the Allegheny river up to the next bridge would offer for the fleet of boats, which usually are moored in the Monongahela, would be a very great advantage for the navigation and commerce on the Ohio river and its tributaries. The two rivers, the Allegheny and the Monongahela, because they rise in different sections of the country, have their ice breaks at different times in the early spring. The mouth of the one offers very desirable refuge to the vessels that are exposed to danger from the breaking up of ice in the headwaters of the other. The Union Bridge at the mouth of the Allegheny was

erected at a time when the Secretary of War was not given specific control over navigable streams, and was not authorized to inhibit the construction of bridges which were likely to obstruct navigation, but it appears that an army engineer, Col. Merrill, in charge of the district, publicly announced that this bridge was an obstruction to navigation when it was erected. It was erected, therefore, in the face of the information given by the best authority that could be consulted in that matter in the government. These are the facts that I find independently of any previous adjudication; but added to this is the finding of my predecessor, Mr. Root, to exactly the same effect, upon which he based an order that the bridge as an obstruction to navigation be abated. This matter is now before me on a petition for rehearing of Mr. Root's order. As an original question, I should have ruled as Mr. Root ruled, and a fortiori, because the orders of this department are not to be lightly set aside, and are to be treated as a decree in equity would be and be set aside only upon a showing of a palpable error or mistake. The petition for rehearing is denied, and the order suspending the operation of Mr. Root's order is now revoked. The order will be put in full force and executed by the proper officers, and the Union Bridge will be notified accordingly."

In pursuance of these directions notice was duly served on the bridge officers.

From these recited facts it is clear that the bridge company had notice of the hearing; that it duly appeared; that on hearing and rehearing its rights were considered; and that, in pursuance of due action by the Secretary of War taken in the premises, it has been determined that the bridge is an unreasonable obstruction to navigation.

These proceedings being regular and in conformity with the act, three questions arise, viz.: First. Had Congress a right to determine what is an unreasonable obstruction to the navigation of an interstate river? Second. Could it delegate such power to the Secretary of War? Third. Is the act of Congress in question unconstitutional, because it provides no compensation to the bridge company? The settlement of these questions is of grave import. On the one hand stand the people at large, represented by the national government, who are interested in the preservation, improvement, and maintenance of the waterways which nature made highways of commerce. On the other hand, we have investors, who, in pursuance of state corporate authority, have built bridges across such highways and invested their funds therein. The country's growth and the expansion of commerce have made these bridges an unreasonable obstruction to navigation, but the bridge owner says to the government, "Unless you pay for the structure, you cannot remove the obstruction." On the other hand, the government says to the bridge builder, "You cannot stay a great national power, or cripple its use by making its exercise unduly costly, by building without government sanction bridges on the very ground you knew the government must use when it came to exercise its constitutional power to improve these waterways for the general good."

But before taking up these contentions, let us first ascertain the facts pertinent to this particular case, and especially the relation of this bridge company to the state of Pennsylvania under charter from which the obstructing bridge was built and under which alone its existence is justified. Now, it will be noted that this charter left the exact location of the bridge to the option of the company, simply authorizing it to build one "over the Allegheny river, at any practicable point

on Duquesne way, between Second street and the Monongahela river and Allegheny avenue, or any other practical point in the City of Allegheny." Neither did it prescribe the kind of bridge, its height, its span width or pier location. All these matters were left to the company, but this general right to build a bridge was granted on the express condition and limitation, inserted by the state in its charter, "that the erection of said bridge shall not obstruct the navigation of said river, so as to endanger the passage of rafts, steamboats or other water crafts; and the piers shall not be so placed as to interfere with tow boats proceeding out with their tows made up, and shall be constructed in such manner as meet the requisitions of the law in regard to the obstructions of navigation." No government or state approval of the bridge, prior to its erection, is shown or alleged. In Dugan v. Bridge Company, 27 Pa. 310, 67 Am. Dec. 464, a charter having a provision of this general character was under consideration, and it was there said by the Supreme Court of Pennsylvania:

"In measuring corporate rights, we are to look at all the terms employed in the fundamental law or compact. We can no more cut out some of them or mitigate their legal effect, because they are in a proviso, than we could qualify the terms of a private agreement because found in one part of the instrument, instead of another. The whole instrument is to be taken together as expressing the final intentions and purposes of the parties. When the Legislature tells the company, 'You may erect a bridge over a particular stream, provided you do not impair the navigation thereof,' it is for the company to determine whether they will accept the franchise on such a condition; but, if they accept it, they take it cum onere, and, having no rights outside of their charter, they must enjoy their franchise, subject to that condition or not enjoy it at all."

But this prohibition against the bridge obstructing navigation thus expressed by the state in its charter was nothing more than the obligation the laws and decisions of that state imposed by implication. Prior to the adoption of the federal Constitution, the province of Pennsylvania, by act of August 14, 1725 (1 Smiths' Laws, p. 168), provided:

"That no bridge, frame or device whatsoever shall at any time to come be made, erected, upheld, sustained or repaired, over any creek or river within this province, navigable for any sloop, shallop, flat, or other craft, that shall or may [in] anywise stop or hinder the navigation of any such sloop, shallop, flat or other craft, or floats of logs: any law, custom or usage to the contrary notwithstanding."

And the special care which Pennsylvania exercises to preserve its waterways from obstructions is seen in Dugan v. Bridge Company, supra, wherein it was said:

"The navigation of the streams of a country is a great public interest, and the law has always treated obstructions as public nuisances. In Rex v. Clark, 12 Mod. 615, Chief Justice Holt said that to hinder the course of a navigable river was against Magna Charta; and many subsequent statutes have punished it, in England, with specific penalties. In this country, and especially in Pennsylvania, the navigation of our rivers has been sedulously guarded both by legislative action and judicial opinion."

Moreover, the courts of that state have held in the case last quoted that a duty is imposed on a bridge company to keep pace with the expansions of commerce, and so change or alter its bridge as not to obstruct such enlarged commerce, saying:

143 F.—25

"The Legislature must be presumed to have had all the natural growth of this trade [coal] in view when they authorized the bridge. * * * We * * * are enabled to say that the true meaning of the act of incorporation is that the bridge was to be so built as not to injure, stop, or interrupt the navigation, either then or now, whether in its infancy or full growth."

In view of these holdings it is clear that this bridge has no warrant or countenance from the state of Pennsylvania to justify its further continuance if it be an obstruction to navigation. Such being the case, we pass to the next question: Has Congress a right to determine what is an unreasonable obstruction to the navigation of an interstate river? By section 8, art. 1, of the Constitution, it is enacted that "Congress shall have power * * * to regulate commerce * * * among the several states * * * to make all laws which shall be necessary and proper for carrying into execution the foregoing powers." In the Wheeling Bridge Case, 18 How. 425, 15 L. Ed. 435, it was decided that Congress had such power, and that its enactment that a certain bridge was not an obstruction to navigation was in effect a vacation of a previous decree of the Supreme Court of the United States that such a bridge was an obstruction. This decision was approved in the later case of South Carolina v. Georgia, 93 U. S. 13, 23 L. Ed. 782, where in discussing it the court said:

"There it was ruled that the power of Congress to regulate commerce includes the regulation of intercourse and navigation, and consequently the power to determine what shall or shall not be deemed, in the judgment of the law, an obstruction of navigation. * * * The case of the Clinton Bridge, 10 Wall. 454, 19 L. Ed. 969, is in full accord with this decision. It asserts plainly the power of Congress to declare what is and what is not an illegal obstruction in a navigable stream."

To the same effect are Gray v. Chicago, 77 U. S. 454, 19 L. Ed. 969, and Miller v. New York, 109 U. S. 393, 3 Sup. Ct. 232, 27 L. Ed. 971, in the latter of which it is said:

"Having power to regulate commerce with foreign nations and among the several states, and navigation being a branch of that commerce, it [Congress] has the control of all navigable waters between the states or connecting with the ocean, so as to preserve and protect their free navigation. Its power, therefore, to determine what shall not be deemed, so far as that commerce is concerned, an obstruction, is necessarily paramount and conclusive."

Indeed, the power of Congress to regulate navigation being established (Gibbons v. Ogden, 9 Wheat. 1, 6 L. Ed. 23; Gilman v. Philadelphia, 3 Wall. 713, 18 L. Ed. 96), and Congress having the constitutional right to make all laws necessary and proper for carrying into execution its powers, it would (apart from all controlling decisions) seem that in Congress must necessarily vest the power to determine what obstructs navigation; for, unless it have power to determine what obstructs, it is without power to control and regulate navigation. And indeed, whether a thing obstructs navigation or not is a question not of law, but fact. "What does encroach on or straighten the harbor, or lessen the depth of water and navigation, is a fact, questio facti (10 Price, 374)," says Mr. Justice Woodbury in United States v. New Bedford Bridge, 1 Woodb. & M. 401, Fed. Cas. No. 15,867. It would therefore follow that Congress should have the power, with the

effectiveness of a judicial decree, to determine what is an obstruction to navigation, or, as was said in the Wheeling Bridge Case, supra:

"The regulation of commerce includes intercourse and navigation, and, of course, the power to determine what shall or shall not be deemed in judgment of law an obstruction to navigation."

Seeing, then, the clear right of Congress to determine what obstructs navigation, we next inquire whether, if having enacted that certain obstructions in certain waters shall be removed, it is restricted to itself determining where such obstructions exist and is without power to call to its aid other aids or agencies in that regard. The broad and general power to regulate commerce being vested in Congress, and that without any limitation as to the means or manner in which it shall be done, the grant would seem to carry with it the implied right to employ every agency needful to the due exercise of the power. "It is a general principle of law in the construction of all powers of this sort that, where the end is required, the appropriate means are given." United States v. Bailey, 9 Pet. 255, 9 L. Ed. 113. Indeed, to strip Congress of the right to resort to departmental aid and professional engineering skill, and to restrict the exercise of its powers in that regard to express legislation affecting each particular case, would be practically prohibitive of all legislation on the subject. The objections to such a course are well stated in United States v. Moline (D. C.) 82 Fed. 592, where it is said:

"The first question [is the bridge an obstruction to navigation] is purely administrative, and is one that Congress can certainly delegate to the Secretary of War. A thousand questions of equal moment to the parties interested and of equal difficulty are necessarily delegated to the great departments of the government every month. In the very nature of things, Congress cannot dispose of them. A government of the size of this, operated upon such a conception, would be clogged immediately."

To the same effect is Chatfield v. New Haven (C. C.) 110 Fed. 792. And in Miller v. New York, 109 U. S. 395, 3 Sup. Ct. 233, 27 L. Ed. 971, it was said:

"The execution of a vast number of measures authorized by Congress and carried out under the direction of heads of departments would be defeated if such were not the case. The efficiency of an act as a declaration of legislative will must, of course, come from Congress, but the ascertainment of the contingency upon which the act shall take effect may be left to such agencies as it may designate."

Reference may also be made to South Carolina v. Georgia, 93 U. S. 13, 23 L. Ed. 782, which recognized the action of the Secretary of War in completely closing one channel of the Savannah river by a crib and forcing the water into another channel under a general grant of money "for the improvement of the harbor of Savannah," as an authorization of such work by Congress. Of course, it must be conceded that the power to legislate—that is, to say what the law is—is vested in Congress alone, but by the act now before us Congress did not delegate to the Secretary of War any power to fix or make the law. By this general act Congress itself enacted what should be done when an obstruction existed and all the power conferred on the Secretary of War was to determine when the law should be enforced; and that

this authority should not be abused a party considering himself ag-
grieved is by the act given a direct appeal to the court of highest re-
sort. That administrative duties in carrying out legislative powers
may be delegated to departments has been held in many cases, among
which we cite Field v. Clark, 143 U. S. 649, 12 Sup. Ct. 495, 36 L.
Ed. 294; Caha v. United States, 152 U. S. 212, 14 Sup. Ct. 513, 38
L. Ed. 415; Bushnel v. Leland, 164 U. S. 684, 17 Sup. Ct. 209, 41 L.
Ed. 598; Railway Co. v. Ohio, 165 U. S. 365, 17 Sup. Ct. 357, 41 L.
Ed. 747; United States v. Ormsbee (D. C.) 74 Fed. 207; Grady v.
United States, 98 Fed. 239, 39 C. C. A. 42; Dastervignes v. United
States, 122 Fed. 35, 58 C. C. A. 346. It being shown, then, that Con-
gress has power to control navigation; that the Allegheny is an inter-
state, navigable stream; that Congress has assumed control over it;
that, acting by the Secretary of War, it has determined the bridge in
question to be an obstruction to navigation and ordered its alteration;
and the bridge company having willfully refused so to do—the burden
of justifying a further continuance of that which the supreme law
making power of the land has determined to be an obstruction to navi-
gation rests upon the bridge company so obstructing. That the
bridge is an obstruction to navigation is now settled, and is not now
open to question. Indeed, no question in that regard has even been
raised in the whole proceeding, either on the hearing in pursuance
of the statute or on the criminal proceeding in this court. It therefore
having been legally determined that the bridge company maintains an
obstruction to navigation, and so fails to "meet the requisitions of the
law in regard to the obstructions of navigation," it can claim no im-
munity or protection from the state of Pennsylvania, whose charter
required that its bridge "shall be constructed in such manner as meet
the requisitions of the law in regard to the obstructions of naviga-
tion."

But it is contended the act of Congress under which this proceeding
is had is unconstitutional because it makes no provision for compen-
sation, and therefore violates the fifth amendment to the Constitution,
which enacts, "Nor shall private property be taken for public use
without just compensation." In this connection it should be noted
that the financial loss sustained by this company is not in point of fact
of the serious character that would at first sight appear. It has a
wooden bridge some 30 years old. In the natural life of such a struc-
ture it would not have been long, were the government taking no
steps, before the company would have to replace it and expend a
large sum of money in so doing. It will thus be seen that the actual
loss to the company is not the cost of erecting a new and modern
bridge, but simply the profit arising from tolls during the life of its
present structure. Moreover, the case does not fall within the literal
terms of the constitutional provision in that no "private property [is]
* * * taken for public use." The facts are not as they were in
the case of the Monongahela Navigation Company v. United States,
148 U. S. 312, 13 Sup. Ct. 622, 37 L. Ed. 463. Its bridge is not taken
and used by the government for public purposes, as were the dams and
locks of the navigation company in that case. Indeed, the right of

the bridge company to maintain a bridge and to collect tolls thereon is not denied, much less taken, and the effect of this proceeding is not to take or condemn its property, but is simply to compel the company to so use its property as not to interfere with the right of the public to an unobstructed use of the stream. It is simply the enforcement of the time-honored maxim which qualifies the absolutism of all property rights: "Sic utere tuo ut non alienum lædas." "So use your own as not to injure another's property." It would be a strange anomaly that a demand made by the law upon one to perform a lawful duty must be preceded by compelling the law enforcer to provide compensation to the law violator for what is maintained in violation of law. It seems to us the statement of such a proposition is an answer to a claim for compensation. There can be, no lawful compensation for an unlawful structure. But waiving its charter condition and the duty this bridge company owes to the state of Pennsylvania, under which alone it justifies the maintenance of this obstruction, we think the paramount right of Congress to require the alteration without compensation of any bridge obstructing navigable interstate waters is, under the decisions of the Supreme Court, clear. In the first place we have a law, enacted by a co-ordinate branch of the government, in which there is no uncertainty. It is directed against all bridges, those already built or to be built. "Any railroad or other bridge now constructed, or which may hereafter be constructed, over any of the navigable waters of the United States," are its words. There can be no doubt of the clear legislative intent to compel alterations of such bridges as obstruct, and that without compensation. Shall this law be set aside as unconstitutional? The question is one of serious import from a national standpoint, for it is clear that, if an obstruction must be paid for before navigation can be improved, the improvement of navigation faces a grave menace. Unfortunate as this might be, still, if the enforcement of any act of Congress sacrifices the constitutional right of the citizen, the act must yield to the higher law of the Constitution. But, when a statute has been passed by the legislative branch of the government, the judicial branch will act with great caution in declaring it unconstitutional, and will do so "only," as Chief Justice Black of Pennsylvania said in Sharpless v. Mayor of Philadelphia, 21 Pa. 164, 59 Am. Dec. 759, "when it violates the constitution clearly, palpably, plainly, and in such manner as to leave no doubt or hesitation on our minds." Or, as Chief Justice Marshall said in Fletcher v. Peck, 6 Cranch, 126, 3 L. Ed. 162:

"The question, whether a law be void for its repugnancy to the Constitution is, at all times, a question of much delicacy, which ought seldom, if ever, to be decided in the affirmative in a doubtful case. The court, when impelled by duty to render such a judgment, would be unworthy of its station, could it be unmindful of the solemn obligations which that station imposes. But it is not on slight implication and vague conjecture that the Legislature is to be pronounced to have transcended its powers, and its acts to be considered as void. The opposition between the Constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other."

Now, in passing this law and thereby seeking to fulfil its constitutional duty to regulate commerce, Congress would properly be guided

by the holdings of the Supreme Court in reference to that power. As we study those decisions, it would seem the views of that court are stated in no uncertain terms. Turning, as we naturally do, to the fountain head of American constitutional construction, we find the dominant power of Congress in that regard was asserted at an early day by Chief Justice Marshall in the case of Willson v. Black Bird Creek Marsh Company, 2 Pet. 245, 7 L. Ed. 412. There a corporation, under authority of a charter from the state of Delaware, built a dam across the navigable water in question. A vessel owner broke down the dam and sought to justify his act on the ground that it was an obstruction to navigation. His contention in that regard was not sustained; the court holding that the dam, having been built by authority of the state of Delaware, was, in the absence of legislation by Congress, a lawful structure. But, in delivering its opinion, the court went further, and said:

"Measures calculated to produce these objects, provided they do not come into collision with the powers of the general government, are undoubtedly within those which are reserved to the states. But the measure authorized by this act stops a navigable creek, and must be supposed to abridge the rights of those who have been accustomed to use it. But this abridgment, unless it comes in conflict with the Constitution or a law of the United States, is an affair between the government of Delaware and its citizens, of which this court can take no cognizance. The counsel for the plaintiffs in error insist that it comes in conflict with the power of the United States 'to regulate commerce with foreign nations, and among the several states.' If Congress had passed any act which bore upon the case; any act in execution of the power to regulate commerce, the object of which was to control state legislation over those small navigable creeks into which the tide flows, and which abound throughout the lower country of the middle and lower states—we should feel not much difficulty in saying that a state law coming to conflict with such act would be void. But Congress has passed no such act."

We cannot but regard this statement of the great Chief Justice at that early day, 1835, a statement, it will be observed, not necessary to the disposition of that case, was purposely inserted to prevent any misunderstanding and as a timely warning to those who might thereafter act under state sanction in placing structures in streams that they were doing so in the face of a dominant, controlling power in Congress, and that, when that dormant power was exercised, all else must yield thereto; that the structure might lawfully be placed there for the time being by state power, but that structures, thus state authorized, might become obstructions, nationally abated, when Congress exercised its dormant, but none the less dominant power, to regulate commerce. And this early assertion of paramount federal control is made in all the later cases where the power is discussed. In them will be found the assertion that the right, when Congress acts, is not concluded by anything the states, or individuals acting under them, have done, that the power of Congress is not affected by its silent acquiescence or inaction, and that it may remove offending structures. Thus the absolute scope of this power when Congress undertook to exercise it is asserted in Williamette Iron Bridge Company v. Hatch, 125 U. S. 1, 8 Sup. Ct. 811, 31 L. Ed. 629, where the court say:

"And although, until Congress acts, the states have the plenary power supposed, yet, when Congress chooses to act, it is not concluded by anything that the states or that individuals by its authority or acquiescence have done, from assuming entire control of the matter, and abating any erections that may have been made, and preventing any others from being made, except in conformity with such regulations as it may impose. It is for this reason, namely, the ultimate (though yet unexerted) power of Congress over the whole subject-matter, that the consent of Congress is so frequently asked to the erection of bridges over navigable streams."

In Escanaba Company v. Chicago, 107 U. S. 683, 2 Sup. Ct. 185, 27 L. Ed. 442, the power of the state, in the absence of congressional legislation to maintain and regulate bridges over interstate navigable waters, was recognized. But the dominant control of Congress and the right to abate state-authorized structures when they obstructed navigation was vigorously asserted. Says Mr. Justice Field:

"Illinois is more immediately affected by the bridges over the Chicago river and its branches than any other state, and is more directly concerned for the prosperity of the city of Chicago, for the convenience and comfort of its inhabitants, and the growth of its commerce. And nowhere could the power to control the bridges in that city, their construction, form and strength, and the size of their draws, and the manner and times of using them, be better vested than with the state, or the authorities of the city upon whom it has devolved that duty. When its power is exercised so as to unnecessarily obstruct the navigation of the river or its branches, Congress may interfere and remove the obstruction. If the power of the state and that of the federal government come in conflict, the latter must control and the former yield. This necessarily follows from the position given by the Constitution to legislation in pursuance of it, as the supreme law of the land. But, until Congress acts on the subject, the power of the state over bridges across its navigable streams is plenary. This doctrine has been recognized from the earliest periods, and approved in repeated cases, the most notable of which are Willson v. Black Bird Creek Marsh Company, 2 Pet. 245, 7 L. Ed. 412, decided in 1829, and Gilman v. Philadelphia, 3 Wall. 713, 18 L. Ed. 96, decided in 1865."

To the same effect is the case of Gilman v. Philadelphia, supra, where, long prior to the building of this bridge, it was said:

"Commerce includes navigation. The power to regulate commerce comprehends the control for that purpose, and to the extent necessary, of all the navigable waters of the United States which are accessible from a state other than those in which they lie. For this purpose, they are the public property of the nation, and subject to all the requisite legislation by Congress. Gibbons v. Ogden, 9 Wheat. 1, 6 L. Ed. 23; Corfield v. Coryell, 4 Washington C. C. 378, Fed. Cas. No. 3,230. This necessarily includes the power to keep them open and free from any obstruction to their navigation, interposed by the state or otherwise, to remove such obstructions when they exist, and to provide, by such sanctions as they may deem proper, against the occurrence of the evil and for the punishment of offenders. For these purposes Congress possesses all the powers which existed in the states before the adoption of the national Constitution, and which have always existed in the Parliament in England. It is for Congress to determine when its full power shall be brought into activity, and as to the regulations and sanctions which shall be provided. United States v. New Bedford Bridge, 1 Woodb. & Minot, 420, 421, Fed. Cas. No. 15,867; United States v. Coombs, 12 Pet. 72, 9 L. Ed. 1004; New York v. Milne, 11 Pet. 102, 155, 9 L. Ed. 648. * * * Lastly, Congress may interpose whenever it shall be deemed necessary by general or special laws. It may regulate all bridges over navigable waters, remove offending bridges, and punish those who shall thereafter erect them. Within the sphere of their authority both the legislative and judicial power of the nation are supreme. A different doctrine finds no warrant in the Constitution, and is abnormal and revolutionary."

In Pound v. Turck, 95 U. S. 459, 24 L. Ed. 525, a dam and boom were placed in the Chippewa river in pursuance of authority granted by the state of Wisconsin. The plaintiff was injured by the obstruction, but the defendant justified, in the absence of congressional legislation, under the state law. The defense, as in the Marsh Creek Case, was held good, but, just as in that case, the court took occasion to assert the paramount control of Congress when it saw fit to exercise such control, saying:

"There are within the state of Wisconsin, and perhaps other states, many small streams navigable, for a short distance from their mouths in one of the great rivers of the country, by steamboats, but whose greatest value in water carriage is as outlets to saw logs, sawed lumber, coal, salt, etc. In order to develop their greatest utility in that regard, it is often essential that such structures as dams, booms, piers, etc., should be used, which are substantial obstructions to general navigation, and more or less so to rafts and barges. But to the Legislature of the state may be most appropriately confided the authority to authorize these structures where their use will do more good than harm, and to impose such regulations and limitations in their construction and use as will best reconcile and accommodate the interest of all concerned in the matter. And, since the doctrine we have deduced from the cases recognizes the right of Congress to interfere and control the matter whenever it may be necessary to do so, the exercise of this limited power may all the more safely be confided to the local Legislatures."

So, also, in Cardwell v. American Bridge Co., 113 U. S. 205, 5 Sup. Ct. 423, 28 L. Ed. 959, while the limited power of the state to control and maintain bridges is recognized, yet the dominant power of Congress to control those so authorized is broadly asserted. Referring to the decisions cited, the court says:

"They recognize the full power of the states to regulate within their limits matters of internal police, which embrace, among other things, the construction, repair, and maintenance of roads and bridges. * * * And that, as to bridges over navigable streams, their power is subordinate to that of Congress, as an act of the latter body is, by the Constitution, made the supreme law of the land; but that, until Congress acts on the subject, their power is plenary. When Congress acts directly with reference to the bridges authorized by the state, its will must control so far as may be necessary to secure the free navigation of the stream."

The argument is, however, advanced that the government, having made no objection to the bridge prior to its erection has in some way, by its inaction legalized the bridge as against itself, and thereby become liable to compensate the owners before ordering its alteration. We are referred, however, to no principle of estoppel or laches that would avail to thus compel the holder of a discretionary power to exert it immediately at peril. "It is for Congress to determine when its full power shall be brought into activity, and as to the regulations and sanctions which shall be provided." Gilman v. Philadelphia, supra, and cases therein cited. And, indeed, to apply an analogous principle, statutes of limitations do not affect the sovereign's rights. If one at his own instance, or acting under authority of a state, should, in the absence of any inducing action by the government, occupy land of the latter and place improvements thereon, manifestly such unauthorized improvement would be no bar to the government abating or removing the same when it saw fit to assert its dominant power. The laches,

if any, are not those of the government, but of the improver who neglected to secure prior federal consent. "It is for this reason, namely, the ultimate (though yet unexerted) power of Congress over the whole subject-matter, that the consent of Congress is so frequently asked to the erection of bridges over navigable streams." Williamette Iron Bridge Co. v. Hatch, supra. And not only, as we have seen, was consent of Congress as a precautionary measure not obtained, but the relation of the government to this stream and the harbor of Pittsburgh were then such as might well admonish a prudent investor proposing to bridge the stream and narrow the harbor to acquaint himself with the .plans of the government before starting such an undertaking. "Whatever is notice enough to excite attention, and put the party on his guard and call for inquiry, is notice of everything to which such inquiry might have led. When a person has sufficient information to lead him to a fact, he shall be deemed conversant of it." Kennedy v. Greene, 3 Myl. & K. 722, quoted in Wood v. Carpenter, 101 U. S. 141, 25 L. Ed. 807, and "means of knowledge with the duty of using ·them are deemed equivalent to knowledge itself, and passive good faith will not serve to excuse willful ignorance." 21 Am. & Eng. Ency. Law, 584, and cases cited. In the County of Mobile v. Kimball, 102 U. S. 698, 26 L. Ed. 238, the subject of improvements in· the line of commerce, and therefore of navigation made under state authorization, was considered. The distinction was drawn between· those of a general nature, which, in the nature of things, must, in order to insure uniformity, be left solely to Congress and those, "where from the nature of the subject or the sphere of its operation, the case is local and limited, special regulations adapted to the immediate locality could only have been contemplated." It was there held that "the· improvement of harbors, bays, and navigable rivers within the state falls within this last category of cases," and in that case, there being. no action by Congress on the subject, legislation by the state of Alabama providing for the improvement of the harbor of Mobile was held legal. But, while the state control thus assumed was recognized, the· court laid down the principle that the inaction of the Congress was not a surrender of the power or a declaration that nothing shall thereafter be done by Congress. "State action," says the court, "upon such subjects can constitute no interference with the commercial power of Congress, for when that acts the state authority is superseded. Inaction of Congress upon these subjects of a local nature or operation, unlike its inaction upon matters affecting all the states and requiring· uniformity of regulation, is not to be taken as a declaration that nothing shall be done with respect to them, but is rather to be deemed a declaration that for the time being, and, until it sees fit to act, they may be regulated by State authority."

Under these authorities, we are of opinion that Congress was acting: within its constitutional limits in enacting that bridges, whenever they obstructed navigation, should be removed, and that without compensation made to the obstructor. The absolute, dominant, controlling· power of Congress over navigation had been asserted before this· bridge was built. While the power of the state· to authorize struct–

ures was recognized, yet the limited nature of that power and that it must be exercised and enjoyed subject to the dominant control of the constitutional, and therefore higher, power, had been as clearly pointed out, so that, when the state of Pennsylvania empowered this company to build its bridge so that it should "meet the requisitions of the law in regard to the obstructions of navigation," there was no doubt as to the source from which those requisitions would ultimately come. In this case Congress has acted, as it strikes us, with great magnanimity and with considerate regard to the situation in which this company itself placed itself. In 1874 the government's engineers reported to it (Chief of Engineers' Report, vol. 2, p. 686) that the bridge was an obstruction as follows:

"Below the Saint Clair street suspension bridge was a space of 3,000 feet, with excellent water at all stages. This space was always occupied by steamboats, to the great relief of the main harbor in the Monongehela, which is usually excessively crowded with coal towboats and barges. This use of the Allegheny has been entirely destroyed by the Union Bridge, as large boats cannot get under the bridge in any stage of water, and small boats cannot do so when the water is above average stages. * * * To thoroughly utilize this improved harbor, it is essential that first class boats should be able to traverse the Allegheny and Monongahela harbors with freedom. But the Union Bridge entirely closes up the mouth of the Allegheny, and thus destroys half of the benefit to be derived from the proposed improvements. * * * In view of all these facts, I am constrained to report that the Union Bridge is a serious and unnecessary obstruction to navigation, and to recommend that measures be at once taken to compel its owners to make such modifications as will permit the safe passage of the boats that usually navigate the Ohio up to Pittsburgh."

Indeed, that Congress, in the face of such information, has allowed this bridge to stand for 30 odd years thereafter and be used meanwhile to reimburse to that extent its owners by tolls, and that during that time the bridge has precluded the use of half the expensive harbor improvements made by the government, are in themselves proof that an absolute power in Congress to remove obstructions to navigation, when it saw fit to exercise the power, was wisely intrusted to that body in full confidence that such power would be exercised with due regard to the situation in which the obstructor had placed himself.

Holding then, as we do, that this law is constitutional, the proceedings under it regular and the verdict of the jury warranted, we dismiss the motion in arrest of judgment, and grant the motion of the government to impose sentence.