**UNITED STATES v. COMMODORE PARK, Inc.**

**No. 5223.**

Circuit Court of Appeals, Fourth Circuit.

June 23, 1944.

DOBIE, Circuit Judge, dissenting.

Vernon L. Wilkinson, Attorney, Department of Justice, of Washington, D. C. (Norman M. Littell, Asst. Atty. Gen., and Harry H. Holt, Jr., U. S. Atty., of Hampton, Va., on the brief), for appellant.

W. R. Ashburn, of Norfolk, Va., for appellee.

Before SOPER, DOBIE, and NORTH-COTT, Circuit Judges.

SOPER, Circuit Judge.

Commodore Park, Incorporated, the owner of real estate in the City of Norfolk, Virginia, brought this suit under the Tucker Act, 28 U.S.C.A. § 41(20), to recover compensation for land and riparian rights alleged to have been taken by the United States in the enlargement of the Hampton Roads Naval Operating Base, especially its aviation facilities, and in the improvement of the navigability of the adjacent waters of Willoughby Bay. The defense was that the acts complained of were performed by the United States in the exercise of its control over commerce and navigation and that no liability to the plaintiff arose therefrom, although certain riparian rights, which the plaintiff had previously enjoyed, were destroyed in the course of the work. The District Judge entered a judgment for the plaintiff and this appeal followed.

The plaintiff acquired a tract of farm land in Norfolk, Virginia, on August 20, 1940 for a real estate development and subsequently expended large sums in improving it for residence purposes, dividing it into lots and erecting houses. When the land was purchased it bordered upon a navigable stream known as Mason Creek which extended southerly from Willoughby Bay for a distance of four or five miles. The land was located on the east side of the creek about one and a quarter miles from the point where it entered the bay and the lots bordering on the creek were deemed especially desirable for residential purposes.

During the summer of 1940 certain plans that had been in the process of formation by officers of the United States for some time came to a culmination. It was decided to enlarge the aviation shore facilities at the Naval Air Station which was then located on the west side of Mason Creek and the south side of Willoughby Bay. The first Supplemental National Defense Appropriation Act of June 26, 1940, 54 Stat. 599, 607, 608[1], appropriated certain sums for the national defense for the fiscal year ending June 30, 1941, including $18,000,000 for additional shore facilities, additional aviation storage facilities, buildings, store houses, accessories and the acquisition of land at the Naval Base. Pursuant to this Act a contract was executed on June 29, 1940 by the United States and a contract for a project, entitled Aviation Shore Facilities, which called for the construction of "bulkheads, dredging, and fill and preparation of landing field" as well as the erection of certain structures, changes in the location of roads, pipe lines and the like at a total estimated cost of $13,700,000.

It was contemplated under this contract that a large seaplane operating base should be developed on the south shore of Willoughby Bay. To this end it was planned to improve the navigability of Willoughby Bay by dredging it to depths from 10 to 14 feet below mean low water so as to provide sufficient areas and depths of water for large patrol seaplanes; and it was also planned to deposit the dredged materials in creeks, sloughs and low areas bordering on Mason and Boush Creeks behind bulkheads, and if necessary, to fill all or a large part of Boush Creek. In recognition of the authority vested in the War Department in regard to the obstruction of navigable waterways by §§ 9 and 10 of the Rivers and Harbors Act of March 3, 1899, 30 Stat. 1151, 33 U.S.C.A. §§ 401, 403, application was

---

[1] Prior Acts of Congress which provided for the acquisition of additional land for the Naval Station were the Act of June 14, 1934, 48 Stat. 957; the Act of April 25, 1939, 53 Stat. 590; and the Act of May 25, 1939, 53 Stat. 757, 773.

made to the War Department for permission to do the work and permission was granted in due course. Subsequently, on May 13, 1941, the War Department authorized as an amendment of the plan that Mason Creek be permanently closed to all navigation.

The United States proceeded to condemn all the remaining land on the west side of Mason Creek to the head waters thereof as an addition to the Naval Station on this side of the creek and also condemned nearly all the land on the east side of the creek except the land of the plaintiff, none of which was condemned. Condemnation proceedings took place in 1940, 1941 and 1942 and included some 2,000 acres of land. In the course of the dredging operations 18,000,000 cubic yards of mud and silt were taken from the bed of Willoughby Bay and deposited in the creeks · and condemned areas south of Willoughby Bay. Mason Creek was filled to a point near the plaintiff's land and a retaining wall was constructed. For this distance the natural channel of the creek, which was about 550 feet wide at the mouth, was filled from side to side and to a height equal to the highest point of the adjoining land; and immediately opposite the land a pond or sink was left.

The result was that the riparian rights appertaining to the land in its prior condition, including the right of access to the navigable waters of the creek and the bay, the utilization of the creek in its natural condition and the advantageous surroundings which it contributed to the adjoining property, were destroyed. The findings of the District Court in this respect were as follows:

"Mason's Creek afforded a ready, convenient outlet from plaintiff's land into Willoughby Bay, and Hampton Roads by motor boats and other vessels of light draft. That stream, so far as the evidence discloses, had never been improved by Governmental action, but, in its natural state, was a very attractive tidal, navigable stream. .

\* \* \* \* \* \*

"The shores on the westward and northwestward sides of plaintiff's land bordered on the navigable part of Mason's Creek and were high, firm, sandy shores, slanting down gradually between high and low water marks. The waterfront lots on that side before the filling and

closing above described, were desirable for waterfront residential property. The presence of navigable water and the riparian rights such as fishing, boating, and the like, incident to the land, contributed very substantially to both its intrinsic and fair market value.

"By filling and closing Mason's Creek all of plaintiff's riparian rights were permanently taken. The part of Mason's Creek not filled was converted into a lake without any outlets, sewers and surface drainage emptied therein and the water became stagnant and filthy. The water used in conveying through pipes the dredged materials from the Bay to the parts of Mason's Creek filled, overflowed the bulkheads and dykes and carried great quanties of mud and silt into the parts of Mason's Creek not filled, and much of it settled along the shore and to a substantial depth on plaintiff's land lying between high and low water marks, and permanently converted that land into undesirable spongy mud bottom."

The District Judge also found that the unfavorable conditions resulting from the work led to vigorous protests by nearby residents and in consequence the Navy Department constructed a culvert from the unfilled part of the creek to the bay and also dredged a channel in the remaining part of the stream deeper than that which had previously existed. Sufficient drainage to prevent an overflow under normal conditions was thereby provided but the water in the unfilled part of the creek remained semi-stagnant and was not fresh and clean as it had previously been in the open creek. This relief dredging gave rise to the additional claim on the part of the plaintiff that mud and silt had been deposited on its land, not only between high and low water mark but also above high water mark. But the District Judge disallowed this part of the claim as he found that no material damage had been suffered in excess of the benefit which the plaintiff had derived from the partial filling of low marshes, inlets and coves on its property. No appeal was taken by the plaintiff.

The ultimate conclusions of the court were that the plaintiff's riparian rights in Mason Creek appertaining to 13 of the lots in Commodore Park were taken and its lands lying between high water and low water marks in the stream were partially taken by the deposit of mud and

silt thereon in consequence of the permanent closing of Mason's Creek and the permanent taking of a large part of the bed of the stream as a spoils area for the deposit of mud and silt dredged from Willoughby Bay. The court also found that the dredging in Willoughby Bay was done in the course of and as an incident to enlarging and expanding the aviation shore facilities of the Hampton Roads Naval Operating Base for the purpose of national defense and not for the purpose of aiding navigation or commerce. Upon these findings the court concluded that the plaintiff was entitled to compensation for this taking of its riparian rights and partial taking of its land and entered a judgment in the sum of $7,870 with interest at 4 per cent from September 1, 1941.

▆ The position of the United States is that since Willoughby Bay and Mason Creek were both navigable waters of the United States when the improvement of the naval base was undertaken, they were within the control of the Government and any private riparian rights in the waters or bed of Mason Creek incident to the ownership of the lands bordering upon the stream were subservient to the dominant power of Congress to improve navigation under the Commerce Clause of the Constitution, Const. art. 1, § 8, cl. 3. This legal proposition is firmly established and cannot be denied. In United States v. Chicago, M., St. P. & P. R. Co., 312 U.S. 592, 596, 597, 313 U.S. 543, 61 S.Ct. 772, 775, 85 L.Ed. 1064, it was said:

"* * * And the determination of the necessity for a given improvement of navigable capacity, and the character and extent of it, is for Congress alone. Whether, under local law,[2] the title to the bed of the stream is retained by the State or the title of the riparian owner extends to the thread of the stream, or, as in this case, to low water mark, the rights of the title holder are subordinate to the dominant power of the federal Government in respect of navigation.

"The power of Congress extends not only to keeping clear the channels of interstate navigation by the prohibition or removal of actual obstructions located by the riparian owner, or others, but comprehends as well the power to improve and enlarge their navigability.

"The bed of a river is 'that portion of its soil which is alternately covered and left bare, as there may be an increase or diminution in the supply of water, and which is adequate to contain it at its average and mean stage during the entire year, without reference to the extraordinary freshets of the winter or spring, or the extreme droughts of the summer or autumn.'

"The dominant power of the federal Government, as has been repeatedly held, extends to the entire bed of a stream, which includes the lands below ordinary high water mark. The exercise of the power within these limits is not an invasion of any private property right in such lands for which the United States must make compensation. The damage sustained results not from a taking of the riparian owner's property in the stream bed, but from the lawful exercise of a power to which that property has always been subject."

Again, in United States v. Appalachian Power Co., 311 U.S. 377, 423, 424, 61 S. Ct. 291, 307, 85 L.Ed. 243, it was said: "The respondent is a riparian owner with a valid state license to use the natural resources of the state for its enterprise. Consequently it has as complete a right to the use of the riparian lands, the water, and the river bed as can be obtained under state law. The state and respondent, alike, however, hold the waters and the lands under them subject to the power of Congress to control the waters for the purpose of commerce. The power flows from the grant to regulate, i. e., to 'prescribe the rule by which commerce is to be governed.' This includes the protection of navigable waters in capacity as well as use. This power of Congress to regulate commerce is so unfettered that its judgment as to whether a structure is or is not a hindrance is conclusive. Its determination is legislative in character. The Federal Government has domination over the water power inherent in the flowing stream. It is liable to no one for its use or non-use. The flow of a navigable stream is in no sense private property; 'that the running water in a great navigable stream is capable of pri-

---

[2] Under the Virginia law the title of an owner of land bordering upon a navigable stream extends to the ordinary low-water mark. Scott v. Doughty, 124 Va. 358, 97 S.E. 802; Hite v. Town of Luray, 175 Va. 218, 8 S.E.2d 369.

vate ownership is inconceivable.' Exclusion of riparian owners from its benefits without compensation' is entirely within the Government's discretion."

In the exercise of this power it has been held that it is not a taking compensable under the Fifth Amendment when the United States, in order to improve navigation, completely ousts the riparian owner from the use of a navigable stream, or removes valuable structures which he has erected therein, or appropriates a portion thereof for a pier, lighthouse, drydock or other structure; Scranton v. Wheeler, 179 U.S. 141, 163, 21 S. Ct. 48, 45 L.Ed. 126; United States v. Chandler-Dunbar Co., 229 U.S. 53, 62, 72, 33 S.Ct. 667, 57 L.Ed. 1063; Gibson v. United States, 166 U.S. 269, 17 S.Ct. 578, 41 L.Ed. 996; or when for the same purpose the Government injures or destroys riparian rights by straightening the channel of a stream or by closing one channel and diverting the water therein to another channel of a stream; State of South Carolina v. Georgia, 93 U.S. 4, 23 L.Ed. 782; Friend v. United States, 30 Ct.Cl. 94. Moreover, it is established that the power of the United States to improve navigation is but a part of its broader power to regulate commerce and that if an improvement serves the larger purpose, it may be made without compensation to a riparian owner even if it interferes with the navigation of the stream, as for example, the erection of a bridge over navigable waters. Stockton v. Baltimore & N. Y. R. Co., C.C.N.J., 32 F. 9, cited in Scranton v. Wheeler, 179 U.S. 141, 149, 159, 161, 21 S.Ct. 48, 45 L.Ed. 126; see also, State of Arizona v. California, 283 U.S. 423, 451, 452, 51 S.Ct. 522, 75 L.Ed. 1154; Washington Water Power Co. v. United States, 9 Cir., 135 F.2d 541. The injuries suffered by the private owners in all these cases are damnum absque injuria.

Relying upon these authorities the Government points out that the damage to the plaintiff's land in the pending case was not different in its nature from the substantial losses suffered by the riparian owners from governmental action in the cited cases; and it is said that in this case as in those, the United States was acting wholly within the scope of its powers over navigable waters which the Supreme Court on more than one occasion has spoken of as "the public property of the nation." Gilman v. Phila-

delphia, 3 Wall. 713, 724, 725, 18 L.Ed. 96; United States v. Chicago, M. St. P. & P. R. Co., 312 U.S. 592, 596, 313 U.S. 543, 61 S.Ct. 772, 85 L.Ed. 1064.

We agree to the extent of saying that the District Judge was wrong in so far as he held that the dredging of Willoughby Bay was not done for the purpose of aiding navigation or commerce. Although the deepening of the bay was incident to the enlargement of the Naval Base for national defense and the primary purpose to be served by the dredging was the accommodation of naval seaplanes and vessels, the project, nevertheless, related to commerce and navigation and was carried out in the exercise of the governmental power in this field. The Supreme Court has held that the control of the federal government over navigation may be exercised in order to accommodate naval vessels. In Greenleaf-Johnson Lumber Co. v. Garrison, 237 U.S. 251, page 268, 35 S.Ct. 551, at page 557, 59 L.Ed. 939, the court sustained the power of the Government to cause the removal of private structures from a river to provide mooring space for its ships, saying: "We may grant that such was the inducement and such the occasional use, but neither militates against the validity of the power exercised. The mooring of vessels is as necessary as their movement, and the navigability of a river can be maintained or increased as legally for the accommodation of war vessels as for trading vessels, those of public ownership as well as those of private ownership, and we cannot enter into a consideration of what may be necessary for either purpose." See, also, Bailey v. United States, 63 Ct.Cl. 77, certiorari denied 273 U.S. 751, 47 S.Ct. 455, 71 L.Ed. 873.

None of these considerations, however, touch the vital fact in the case at bar that the deposit in Mason Creek of the material dredged from Willoughby Bay had no relationship to navigation or commerce. The deepening of the one body of water and the fill in the other were not integral and related parts of a single enterprise, as happened, for example, in State of South Carolina v. Georgia, 93 U. S. 4, 23 L.Ed. 782, where one of two channels of a stream was closed to the detriment of a riparian owner in order to improve the navigability of the other channel. Doubtless the method devised by the engineers for the disposition of

the refuse was economical and expeditious but the result of it was that the navigability of the stream was permanently impaired while the navigability of the bay was improved to no greater extent than if the dredged material had been hauled to a more distant point. In short, the closing of the stream did not in any way serve the interests of commerce or navigation.

■■■ The United States is not clothed with unlimited authority to deal with navigable waters as if they were its own.[3] The statement of the Supreme Court that the navigable waters of the United States are "the public property of the nation" was not intended to convey the idea that the United States has the absolute ownership of the beds of navigable streams and may make any use of them that it sees fit. The exact language used by the Supreme Court in United States v. Chicago, M. St. P. & P. R. Co., 312 U.S. 592, 595, 596, 313 U.S. 543, 61 S.Ct. 772, 775, 85 L.Ed. 1064, quoting from Gilman v. Philadelphia, 3 Wall. 713, 724, 18 L.Ed. 96, was: "The power to regulate commerce comprehends the control for that purpose, and to the extent necessary, of all the navigable waters of the United States which are accessible from a State other than those in which they lie. *For this purpose* they are the public property of the nation, and subject to all the requisite legislation by Congress."[4] That the power and control of the national government over navigable waters is limited to the purpose set out in the Constitution is shown by what was said in United States v. Appalachian Power Co., 311 U.S. 377, 426, 61 S.Ct. 291, 308, 85 L.Ed. 243: "In truth the authority of the United States is the regulation of commerce on its waters. Navigability, in the sense just stated, is but a part of this whole. Flood protection, watershed development, recovery of the cost of improvements through utilization of power are likewise parts of commerce control. *As respondent soundly*

argues, the United States cannot by calling a project of its own 'a multiple purpose dam' give to itself additional powers, but equally truly the respondent cannot, by seeking to use a navigable waterway for power generation alone, avoid the authority of the Government over the stream. That authority is as broad as the needs of commerce. * * *"

The last-mentioned case cited with approval the prior decision of the court in United States v. River Rouge Co., 269 U.S. 411, page 419, 46 S.Ct. 144, at page 147, 70 L.Ed. 339, wherein the limits of the power of the United States over navigable waters was emphasized in the following passage: "The right of the United States in the navigable waters within the several States is, however, 'limited to the control thereof for the purposes of navigation.' Port of Seattle v. Oregon Railroad, 255 U.S. 56, 63, 41 S.Ct. 237, 239, 65 L.Ed. 500. And while Congress, in the exercise of this power, may adopt, in its judgment, any means having some positive relation to the control of navigation and not otherwise inconsistent with the Constitution, United States v. Chandler-Dunbar Co., supra [229 U.S. 53], 62, 33 S.Ct. 667 [57 L.Ed. 1063], it may not arbitrarily destroy or impair the rights of riparian owners by legislation which has no real or substantial relation to the control of navigation or appropriateness to that end. In Yates v. Milwaukee, supra [10 Wall. 497], 504 [19 L.Ed. 984], it was said in reference to the right of a riparian owner on a navigable stream: 'This riparian right is property and is valuable, and though it must be enjoyed in due subjection to the rights of the public, it cannot be arbitrarily or capriciously destroyed or impaired.' This language was cited with approval in Illinois Central Railroad v. Illinois, supra, [146 U.S. 387], 445, 13 S.Ct. 110 [36 L.Ed. 1018]."

In view of this limitation upon the power of the Government and the finding that the closing of Mason Creek did

---

3 There is no authority for the broad proposition that the United States has the absolute right to deposit material dredged from navigable waters in any other navigable waters within its control. A statement from the opinion of the Attorney General in 22 Opp. Atty. Gen. 646, 649, seems to give support to such a rule, but only when separated from its context. It was made in support of the power of the United States to

deposit material, which it had dredged from Lake Erie, in the Lake within eight miles of the City of Chicago notwithstanding the prohibitory provisions of a city ordinance. The Attorney General was merely deciding that the authority of the United States over the navigable waters of the Lake was superior to that of the municipality. No private riparian rights were involved.

4 Italics supplied.

not aid either commerce or navigation, the judgment of the District Court will be affirmed.

Affirmed.

DOBIE, Circuit judge (dissenting).

I must dissent from the majority opinion on one phase of this case. It seems to me that the dredging was clearly in furtherance of commerce and navigation and that the deposit of the dredged material in Mason Creek was an integral part of this improvement in navigation.

Accordingly, I think that Commodore Park is entitled to no recovery from the United States for any damages resulting from the destruction of its riparian rights through the deposit of the dredged material between the low-water mark and the high-water mark of Mason Creek. See Transportation Co. v. Chicago, 99 U.S. 635, 25 L.Ed. 336; Gibson v. United States, 166 U.S. 269, 273, 17 S.Ct. 578, 41 L.Ed. 996; Scranton v. Wheeler, 179 U.S. 141, 21 S.Ct. 48, 45 L.Ed. 126; Slingerland v. International Contracting Co., 169 N.Y. 60, 61 N.E. 995, 56 L.R.A. 494; Home for Aged Women v. Commonwealth of Massachusetts, 202 Mass. 422, 89 N.E. 124, 24 L.R.A.,N.S., 79. And see, particularly, the opinion of Attorney General Griggs (1899), 22 Opp.Atty.Gen., 646, 649, in which it was said: "Congress has power to regulate and improve the harbors of the navigable waters of the United States, and this carries with it the right to deposit the material removed in making improvements in any other part of the harbor or navigable waters or other place within its control."