**UNITED STATES of America,
Plaintiff,**

v.

**8,968.06 ACRES OF LAND MORE OR LESS, Situated IN CHAMBERS AND LIBERTY COUNTIES, TEXAS, Defendant.**

**Civ. A. No. 68–G–29.**

United States District Court,
S. D. Texas,
Galveston Division.
Sept. 24, 1970.

Anthony J. P. Farris, U. S. Atty., Frank C. Cooksey, Asst. U. S. Atty., Houston, Tex., Dollie M. Smith and Robert M. McKee, U. S. Dept. of Justice, Washington, D. C., for plaintiff.

Harold R. DeMoss, Jr., and Patrick Oxford, of Bracewell & Patterson, Houston, Tex., for defendant.

MEMORANDUM AND ORDER:

NOEL, District Judge.

This case involves a taking of land by the United States for the Wallisville Reservoir Project, which is dedicated in part to the improvement of navigation. The tract in controversy comprises almost 9,000 acres on the Trinity River, beginning approximately two and one-half miles from its mouth and extending about twelve miles upstream. Used for agriculture many years, the property is now bisected by an interstate highway and is about thirty-five minutes driving time from downtown Houston. The riparian nature of the land, and the significance of that factor for the issue of valuation, give rise to the present dispute.

In accordance with what they consider to be established principles of condemnation law, defendants intend to show that the land is suited for recreational/residential development by reason of its proximity to the populous metropolitan Houston area and to the Trinity River. In particular, defendants would show that the property is well suited for channel-cut subdivision—a type of land development which contemplates the digging of private channels within a residential subdivision in such a manner as to provide each lot with access to a channel, with the soil from the channel cuts being used

to raise the elevation of the building site lots.

The United States has filed a motion in limine asking that all evidence of value which arises from or is attributable to access to or utilization of navigable waters be excluded on the issue of valuation. If granted in the requested form, this motion would effectively frustrate the primary land use showing which defendants propose to make.

The ground upon which this issue will be joined is a line of cases culminating in United States v. Rands, 389 U.S. 121, 88 S.Ct. 265, 19 L.Ed.2d 329 (1967). In that case, the Supreme Court held that the owner of land along the Columbia River in Oregon was not entitled to be compensated for its potential value as a port site when it was taken by the United States. The theory of the case was that since the Government, in the exercise of its dominant "navigational servitude," has the power to totally exclude private port owners from access to navigable waters, to compensate for the loss of port value would be to create private claims in the public domain. More simply, the Fifth Amendment does not require that a riparian landowner be paid for the loss of those elements of value which did not belong to him in the first place. In defining the scope of the *Rands* case, it is necessary to take some note of the historical development of the navigational servitude doctrine.

It has been undisputed since Gibbons v. Ogden, 9 Wheat. 1, 6 L.Ed. 23 (1824), that the power of Congress to regulate commerce includes the power to regulate navigation with foreign nations and among the states. This power comprehends control, to the extent necessary, of all the navigable waters of the United States. Gilman v. Philadelphia, 3 Wall. 713, 18 L.Ed. 96 (1866). Insofar as the riparian right of access to the navigable part of a stream is a property right, it is enjoyed "subject to the obligation to suffer the consequences of the improvement of navigation in the exercise of the dominant right of the Government in that regard." Gibson v. United States, 166 U.S. 269, 276, 17 S.Ct. 578, 580, 41 L.Ed. 996 (1897).

This right, power, or privilege of the Government has been given many tags. These include public right of navigation,[1] dominant power in respect of navigation,[2] dominant power to control and regulate navigable waters,[3] superior navigation easement,[4] and dominant navigational servitude.[5] Although the aptness of the last description has been questioned on Hohfeldian grounds,[6] it appears to have become the accepted usage and will be used here. Similarly, there is a variety of viewpoints as to the origin of the

1. United States v. Chandler-Dunbar Water Power Co., 229 U.S. 53, 62, 33 S.Ct. 667, 57 L.Ed. 1063 (1913).

2. United States v. Chicago, M., St. Paul & P. RR., 312 U.S. 592, 596, 61 S.Ct. 772, 85 L.Ed. 1064 (1941).

3. United States v. Commodore Park, Inc., 324 U.S. 386, 390, 65 S.Ct. 803, 89 L.Ed. 1017 (1945).

4. United States v. Gerlach Live Stock Co., 339 U.S. 725, 736, 70 S.Ct. 955, 94 L.Ed. 1231 (1950).

5. United States v. Rands, 389 U.S. 121, 123, 88 S.Ct. 265, 19 L.Ed.2d 329 (1967).

6. "Analysis of the government interest in terms of a servitude or right is technically incorrect, since the Commerce Clause delegated to the Government power, not property. United States v. Central Stockholders' Corp., 52 F.2d 322 (9th Cir. 1931) ; The Supreme Court, 1949 Term, 64 Harv.L.Rev. 114, 139. However, description as a power to improve navigation is inadequate. The exercise of all governmental powers is conditioned by the requirement of just compensation. Monongahela Navigation Co. v. United States, 148 U.S. 312 [13 S.Ct. 622, 37 L.Ed. 463] (1893). But the Government may take stream beds to improve navigation without compensation. United States v. Chandler-Dunbar Co., supra. The Government interest is best described by what Hohfeld calls a privilege. Hohfeld, Fundamental Legal Conceptions 39 (1923)." Note, Power Site Value in Eminent Domain Proceedings: A New Toll Charge for Water Resource Development, 65 Yale L.J. 96, fn. 5 (1955).

servitude.[7] It has been variously attributed to Magna Carta,[8] the common law,[9] and the Commerce Clause. As the last view prevails in the federal cases, and was recently endorsed in *Rands*, it shall be followed insofar as it is relevant to this decision.

Although of doubtful proper name and uncertain ancestry, there is nothing ambiguous about the drastic consequences which may result from the operation of this doctrine upon owners of riparian fast lands whose property is affected by a navigational improvement project. They are not entitled to restrain injury or to receive compensation for damage incidental to such improvements. In South Carolina v. Georgia, 93 U.S. 4, 23 L.Ed. 782 (1876), the State of South Carolina filed an equity bill in the Supreme Court to enjoin the damming of a channel on the Savannah River, pursuant to an Act of Congress, complaining that the effect would favor the Port of Savannah to the detriment of South Carolina. In dismissing the bill, the Court held that Congress was empowered to eliminate the channel on the Carolina bank if the overall purpose of the project was to serve navigation. Nor is the Government bound to respond in damages when riparian land loses value as a result of access to navigable water being cut off by a navigational improvement. In Gibson v. United States, *supra,* the loss of access to a dock from which a farmer marketed her produce, by virtue of the construction of a Government dike, was held to be noncompensable. *Accord,* Scranton v. Wheeler, 179 U.S. 141, 21 S. Ct. 48, 45 L.Ed. 126 (1900). In a more recent case, United States v. Commodore Park, Inc., 324 U.S. 386, 65 S.Ct. 803,

89 L.Ed. 1017 (1945), the riparian land was residential property located upon a navigable creek emptying into a navigable bay. The Government dredged the bay, casting silt into the mouth of the creek, thereby damming it and causing it to stagnate. The resulting attrition in the riparian owner's land value was held to be noncompensable. "Respondent's property was always subject to a dominant servitude: it did not have a vested right to have this navigable stream remain fixed and unaltered simply because of the consequent reflected additional market value to adjacent lands." 324 U.S. at 391, 65 S.Ct. at 805.

In the cases cited above, the Governmental activity for the improvement of navigation was limited to that area of the bed and banks which lies below the ordinary high-water mark. The result of noncompensation for damages incidental to such activity was entirely consistent with the traditional scope of the servitude, which extends to the entire bed of the stream and includes lands below ordinary high-water mark. United States v. Chicago, M., St. P. & P.RR. Co., 312 U.S. 592, 61 S.Ct. 772, 85 L.Ed. 1064 (1941); United States v. Willow River Power Co., 324 U.S. 499, 65 S.Ct. 761, 89 L.Ed. 1101 (1945). However, when the Governmental activity involves a physical invasion of fast lands, the Fifth Amendment requires that compensation be paid. In United States v. Kansas City Life Insurance Co., 339 U.S. 799, 70 S.Ct. 885, 94 L.Ed. 1277 (1950), the Government's maintenance of the Mississippi River at an artificially high level caused subterranean flooding of agricultural fast lands located on a nonnavigable tributary. This was held to

7. "When the most august court in the world * * * compels the riparian owner to bear an undue share of the cost of the public improvement of navigation, the reason for such course should be so convincing as to command universal approval * * *. (T)he first outstanding fact is that the reasons given by the different judges who have passed upon the question are not uniform, almost every decision having been placed on a

different ground from the others." Annotation by H. P. Farnham, author of Law of Waters (1904), at 21 A.L.R. 206, 216.

8. See Note, The Public Trust in Tidal Areas: A Sometime Submerged Traditional Doctrine, 79 Yale L.J. 762, 767 (1970).

9. See 4 Water & Water Rights § 305.1 (Clark, ed. 1970).

be a taking of property in the constitutional sense. Pointing out that the navigational servitude is bounded by the high-water mark, the Court stated " \* \* \* (I)t is consistent with the history and reason of the rule to deny compensation where the claimant's private title is burdened with this servitude but to award compensation where his title is not so burdened." 339 U.S. at 808, 70 S.Ct. at 890. Like any other direct taking of private property for a public use, the taking of fast lands adjacent to navigable waters is subject to the requirement that just compensation be paid. As the Supreme Court stated in Monongahela Navigation Co. v. United States, 148 U.S. 312 at 336, 13 S.Ct. 622 at 630, 37 L.Ed. 463 (1893):

> Congress has supreme control over the regulation of commerce, but if, in exercising that supreme control, it deems it necessary to take private property, then it must proceed subject to the limitations imposed by this fifth amendment, and can take only on payment of just compensation. The power to regulate commerce is not given in any broader terms than that to establish post offices and post roads; but, if Congress wishes to take private property upon which to build a post office, it must either agree upon the price with the owner, or in condemnation pay just compensation therefor.

█ It being clear that the navigable servitude doctrine does not suspend the Fifth Amendment, a question arises as to the effect of that doctrine upon the measure of value of riparian property which is taken for the improvement of navigation. The question is answered by four Supreme Court cases.

In United States v. Chandler-Dunbar Water Power Co., 229 U.S. 53, 33 S.Ct. 667, 57 L.Ed. 1063 (1913), the Government condemned riparian land along a navigable river, upon which a water company was operating a power facility. In computing the award for the fast lands taken, the trial court included their value for use as a factory site in connection with the development of power.[10] The Supreme Court held that the inclusion of that element was erroneous because "The government had dominion over the water power of the rapids and falls, and cannot be required to pay any hypothetical additional value to a riparian owner who had no right to appropriate the current to his own commercial use." 229 U.S. at 76, 33 S.Ct. at 677. In United States v. Twin City Power Co., 350 U.S. 222, 76 S.Ct. 259, 100 L.Ed. 240 (1956), the condemnees sought to show the value of their riparian land as a site for hydroelectric power operations. Reasoning that such value inheres in the flow of the stream and can be granted or withheld at the pleasure of the Government, the Court held that it was not a compensable interest. The same result was reached in United States v. Virginia Electric & Power Co., 365 U.S. 624, 81 S.Ct. 784, 5 L.Ed.2d 838 (1961), also involving a hydroelectric site. In that case, the condemned interest was a flowage easement which the power company had obtained from a previous fee owner. The Court held that the easement had compensable value only to the extent that it represented the right to destroy non-riparian uses of the servient estate such as agriculture, grazing, and timber production. Any element of value arising from the availability of the land for water power purposes attributable to its location on a navigable stream must be excluded. "(J)ust as the navigational privilege permits the Government to reduce the value of ri-

10. The trial court also allowed for potential value as a site for locks and canals, and the Supreme Court affirmed on the point. This has subsequently been a prolific source of confusion. In Twin City, it was dismissed as aberrational. 350 U.S. at 226, 227, 76 S.Ct. 259. The Rands case laid it to rest: "That aspect of the (Chandler-Dunbar) decision has been confined to its special facts, and, in any event, if it is at all inconsistent with Twin City, it is only the latter which survives." 389 U.S. at 126, 127, 88 S.Ct. at 269. See 1 Orgel, Valuation Under Eminent Domain, p. 369 note 38 (2d ed. 1953).

parian lands by denying the riparian owner access to the stream without compensation for his loss * * * *it also permits the Government to disregard the value arising from this same fact of riparian location in compensating the owner when fast lands are appropriated.* 365 U.S. at 629, 81 S.Ct. at 788. (Emphasis added.)

Chandler-Dunbar, Twin City, and Virginia Electric dealt with the potential value of riparian lands as power sites, and defendants suggest that those cases can be so limited. This contention was rejected in Rands, discussed supra, where a unanimous Court held that the port site value of condemned riparian land was noncompensable. "We are asked to distinguish between the value of the land as a power site and its value as a port site. * * * In both cases, special value arises from access to, and use of, navigable waters. With regard to the constitutional duty to compensate a riparian owner, no distinction can be drawn." 389 U.S. at 124, 125, 88 S.Ct. at 268.

The remaining problem is to determine where to draw the line between potential land uses which may be shown and those which may not—and to draw that line in the case at bar. The cases give the answer, and the test is a simple one: Is that use one which the United States, in the exercise of its dominant navigational servitude, has the power to prohibit or destroy without incurring the constitutional duty to compensate?

Defendants assert that permits for channel cut developments are routinely issued by the Corps of Engineers. The relative facility with which permis-

sion might be obtained is irrelevant.[11] The fact remains that such a right "has value or is an empty one dependent solely on the Government. What the Government can grant or withhold and exploit for its own benefit has a value that is peculiar to it and that no other user enjoys." Twin City, supra, 350 U.S. at 228, 76 S.Ct. at 263.

Accordingly, the Government's motion in limine must be granted.[12] It follows from this that defendants may not show land value arising from potential channel-cut subdivision adjacent to navigable waters.

It should be noted that the Government's motion would exclude values arising from utilization of and access to navigable streams. The choice of language is consistent with the servitude cases, but, taken literally, could easily carry us beyond the scope of their holdings. The navigable servitude doctrine, broad as it is, does not require us to pretend for all purposes that 9,000 acres of land in the Trinity bottoms is 9,000 acres of tumbleweed in the trans-Pecos. The doctrine, an abstraction which has been burdened by broad dicta, should be applied in a reasonable and pragmatic manner. In Virginia Electric, supra, the value of the power company's flowage easement for non-hydroelectric purposes was held to be compensable.[13] Since a flowage easement without water is not only a logical nullity but valueless, that holding clearly authorizes some practical consideration of waterside locational factors.

Therefore, I will not require exclusion of value which may be attributa-

---

11. That such a license may or may not be routinely granted is not significant. "It is irrelevant that the licensing authority presently being exercised over hydroelectric projects may be different from, or even more stringent than, the licensing of port sites." Rands, 389 U.S. at 125, 88 S.Ct. at 265.

12. This includes, of course, paragraph five of the motion. The reduction of award by an amount equal to the value of special and direct benefits to an untaken remainder is entirely proper. United

States v. River Rouge Improvement Co., 269 U.S. 411, 46 S.Ct. 144, 70 L.Ed. 339 (1926), which is not inconsistent with Twin City. See Rands, 389 U.S. at 125, 88 S.Ct. 265.

13. This feature of the Virginia Electric case is not without its mysteries. See Note, The Supreme Court, 1960 Term, 75 Harv.L.Rev. 40, 125 (1961); B. W. Bartke, The Navigation Servitude and Just Compensation—Struggle for a Doctrine, 48 Ore.L.Rev. 1, 18 (1968).

ble to *passive proximity* to navigable waters. For example, if they can do so, defendants are entitled to show that a willing seller and willing buyer would place monetary value upon the recreational and aesthetic benefits of feeling the breezes, watching the water, swimming, fishing, and fowling. Though obviously requiring access to and utilization of water, such activities are nonintrusive upon the federal domain, do not appropriate the flow of the stream, do not involve wharfs, piers, damming, cutting, dredging, or channeling, and do not require the leave of the Federal Power Commission, Corps of Engineers, or other delegatees of the Commerce Power. This Court will not attempt to anticipate the myriad waterside uses from which value might derive and rule on each prospectively. It is expected that the parties, guided by the general principles set out above, will be able to stipulate the details.

One more matter remains for disposition. Defendants have filed a motion in limine asking that any depreciative consequences of riparian location, such as occasional flooding, be excluded. The reasoning appears to be that since the Government can exclude enhancement factors, the defendants should be able to exclude depreciative factors. Although this proposition has a certain surface symmetry, it is unsupported by authority and ignores the fact that the Government's position rests upon sound and independent legal grounds for which no *quid pro quo* need be given. It must be rejected.

The Court is aware that this decision reaches a result which is harsh upon the condemnees and which, superficially, appears to depart from the market value standard of just compensation. In their excellent brief, defendants have pointed out that the prospect of diminished compensation for riparian property may have an unsettling effect on the mortgage markets and may retard development of riparian lands. Although possibly valid, this argument implies a corrective which is available only through the po-

litical process, and is thus addressed to the wrong forum.

Plaintiff's motion in limine is granted.

Defendants' motion in limine is denied.